No. 23-13768

In the

# United States Court of Appeals
## for the Eleventh Circuit

———————

CAMDEN COUNTY

*Plaintiff-Appellant,*

v.

UNION CARBIDE CORP.

*Defendant-Appellee.*

———————

On Appeal from the United States District Court for the
Southern District of Georgia, Brunswick Division.
No. 2:22-cv-00077-LGW-BWC — Lisa Godbey Wood, *Judge*

———————

## BRIEF OF APPELLANT CAMDEN COUNTY

———————

Edward A. Bedard
Jeremy U. Littlefield
Richard L. Robbins
ROBBINS ALLOY BELINFANTE
  LITTLEFIELD LLC
500 14th St. NW
Atlanta, GA 30318
Tel: (678) 701-9381

*Counsel for Appellant
Camden County*

*Camden County v. Union Carbide Corp.*
No. 23-13768

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rules 26.1-1 through 26.1-3, counsel for Plaintiff-Appellant Camden County hereby certify that the below is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal:

1. ALSTON & BIRD LLP. Counsel for Defendant-Appellee Union Carbide Corp.

2. Arnold, Douglas S. Counsel for Defendant-Appellee Union Carbide Corp.

3. Balbo, Luca. Vice President of Defendant-Appellee Union Carbide Corp.

4. Bedard, Edward A. Counsel for Plaintiff-Appellant Camden County.

5. Bishop, James A. Counsel for Defendant-Appellee Union Carbide Corp.

6. Brant, Lannie. Vice-Chair of the Camden County Board of Commissioners.

7. Camden County, Georgia. Plaintiff-Appellant.

8. Casey, Ben. Chair of the Camden County Board of Commissioners.

9. Cashbaugh-Sanchez, Lisa. Vice President of Defendant-

*Camden County v. Union Carbide Corp.*
No. 23-13768

Appellee Union Carbide Corp.

10. Cheesbro, Hon. Benjamin W. Magistrate Judge in the underlying case.

11. The Dow Chemical Company. Defendant-Appellee Union Carbide Corp. is a wholly owned subsidiary of The Dow Chemical Company.

12. Dow, Inc. NYSE: DOW. Defendant-Appellee Union Carbide Corp. is a wholly owned subsidiary of The Dow Chemical Company, which is a wholly owned subsidiary of Dow, Inc., which is a publicly traded company.

13. Goodman, Jim. Camden County Commissioner.

14. Heinberg, Marshall A. Director of Defendant-Appellee Union Carbide Corp.

15. Huber, Shannon. Vice President of Defendant-Appellee Union Carbide Corporation.

16. John S. Myers, P.C. Counsel for Plaintiff-Appellant Camden County in the underlying case.

17. Littlefield, Jeremy U. Counsel for Plaintiff-Appellant Camden County.

18. Lyons, Heather. Vice President of Defendant-Appellee Union Carbide Corporation.

19. Massey, Shandell. General Counsel, Secretary, and Vice

*Camden County v. Union Carbide Corp.*
No. 23-13768

President of Defendant-Appellee Union Carbide Corporation.

20. Massey, W. Clay. Counsel for Defendant-Appellee Union Carbide Corporation.

21. Molina, Ignacio. Director, Vice President, Chief Financial Officer, and Treasurer of Defendant-Appellee Union Carbide Corporation.

22. Myers, John S. Counsel for Plaintiff-Appellant Camden County in the underlying case.

23. Readdick, Trevor. Camden County Commissioner.

24. Robbins, Richard L. Counsel for Plaintiff-Appellant Camden County.

25. Robbins Alloy Belinfante Littlefield, LLC. Counsel for Plaintiff-Appellant Camden County.

26. Signorini, Fernando Fernandes. Director, Chairman of the Board, President, and Chief Executive Officer of Defendant-Appellee Union Carbide Corporation.

27. Tessin, Brian. Assistant Secretary of Defendant-Appellee Union Carbide Corporation.

28. The Bishop Law Firm. Counsel for Defendant-Appellee Union Carbide Corporation in the underlying litigation.

29. Turner, Martin. Camden County Commissioner.

30. Union Carbide Corp. Defendant-Appellee.

*Camden County v. Union Carbide Corp.*
No. 23-13768

31. Vreeland, Shannon N. Counsel for Defendant-Appellee Union Carbide Corporation.

32. Wood, Hon. Lisa Godbey. Judge in the underlying case.

## STATEMENT REGARDING ORAL ARGUMENT

This case presents an issue of first impression under Georgia law: whether a County can recover taxpayer funds paid pursuant to a contract, where the underlying authorization for the contract has been "repealed" by voter referendum under the "Home Rule Paragraph" of the Georgia Constitution. Ga. Const. art. IX, § 2, ¶ 1. The Georgia Supreme Court affirmed the constitutionality of the referendum but did not address the status of the contract following the referendum. *Camden County v. Sweatt*, 315 Ga. 498, 883 S.E.2d 827 (2023). The County contends that a "repeal" of the contract's underlying authorization renders the contract void, thereby allowing the County to recover taxpayer funds paid pursuant to the voided contract under a theory of unjust enrichment and money had and received. The district court, however, held that the contract remained valid notwithstanding the referendum, and the existence of a legal contract precluded the County's claims.

The County believes oral argument would facilitate the Court consideration of these important and novel issues. Accordingly, the County requests oral argument. Fed. R. App. P. 34(a)(2)(B).

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ........................................................i

Table of Authorities...........................................................................iv

Jurisdiction.....................................................................................ix

Statement of Issues ...........................................................................1

Introduction.....................................................................................2

Statement of the Case ........................................................................4

    I.   The Board of Commissioners authorizes the Option
        Agreement with Union Carbide....................................................4

    II.  Camden County voters repeal the Board Resolutions that
        authorized the Option Agreement. .................................................7

    III. Camden County challenges the constitutionality of the
        referendum and initiates this lawsuit to enforce the
        contract...................................................................................8

    IV. The Georgia Supreme Court affirms the constitutionality of
        the Referendum........................................................................9

    V.  The District Court dismisses the County's Amended
        Complaint..............................................................................10

    VI. Standard of review. .................................................................12

Summary of the Argument .................................................................12

Argument......................................................................................14

    I.   The Referendum voided the Option Agreement by
        "repealing" the Board Resolutions that authorized it...............14

        A.  The Home Rule Paragraph empowers voters to revoke
            or rescind the actions of elected county officials and
            render them void. .................................................................16

## TABLE OF CONTENTS
### (continued)

B.  The Option Agreement was voidable and subject to revocation by popular referendum......................................20

C.  The district court's "repudiation" interpretation is inconsistent with the text and structure of the Home Rule Paragraph. ...................................................................26

II.  Georgia's Contract Clause does not negate the voters' approval of a referendum that "repealed" the Board Resolutions that authorized the Option Agreements. ...............28

1.  Neither the Board Resolutions nor the Referendum were legislative acts. ......................................................29

2.  Union Carbide did not have any "vested" rights in the Option Agreement. ..............................................35

III. The voluntary-payment doctrine does not bar recovery of funds paid out under a void and unauthorized contract............37

Conclusion ...........................................................................38

Addendum – Relevant Constitutional Text .......................................A-1

# TABLE OF AUTHORITIES

## Cases

*75 Acres, LLC v. Miami-Dade Cnty., Fla.*,
  338 F.3d 1288 (11th Cir. 2003) ............................................... 31

*Borders v. City of Atlanta*, 298 Ga. 188, 779 S.E.2d 279 (2015) ............ 36

*Burke v. Wheeler County*, 54 Ga. App. 81,
  187 S.E. 246 (1936) ............................................... 3, 14, 25, 38

*Busbee v. Ga. Conf., Am. Ass'n of Univ. Professors*,
  235 Ga. 752, 221 S.E.2d 437 (1975) ........................................ 20, 33, 34

*Butts Cty. v. Jackson Banking Co.*, 129 Ga. 801, 60 S.E. 149 (1908) ..... 25

*Camden Cty. v. Sweatt*, 315 Ga. 498,
  883 S.E.2d 827 (2023) ........................................ i, 9–10, 18, 20, 26, 28

*Chicago Miracle Temple Church, Inc. v. Fox*,
  901 F. Supp. 1333 (N.D. Ill. 1995) ....................................... 32

*Citizens' Sav. Bank v. City of Owensboro*, 173 U.S. 636 (1899) ....... 21, 22

*City of Atlanta v. Airways Parking Co.*, 225 Ga. 173,
  167 S.E.2d 145 (1969) ......................................................... 29

*City of Baldwin v. Woodard & Curran, Inc.*, 293 Ga. 19,
  743 S.E.2d 381 (2013) ......................................................... 15

*City of Gainesville v. Edwards*, 112 Ga. App. 672,
  145 S.E.2d 715 (1965) ......................................................... 37

*City of Guyton v. Barrow*, 305 Ga. 799, 828 S.E.2d 366 (2019) ............. 17

*City of Waycross v. Bennett*, 356 Ga. App. 713,
  849 S.E.2d 33 (2020) ......................................................... 37

*Clarke v. Johnson*, 199 Ga. 163, 33 S.E.2d 425 (1945) ............................ 16

*Crymes v. DeKalb Cty., Ga.*, 923 F.2d 1482 (11th Cir. 1991) ................ 31

*Deal v. Coleman*, 294 Ga. 170, 751 S.E.2d 337 (2013) ............................ 29

# TABLE OF AUTHORITIES
## (continued)

*DeKalb Cty. Sch. Dist. v. Georgia State Bd. of Educ.*,
  294 Ga. 349, 751 S.E.2d 827 (2013) ..................................................... 18

*DeKalb Cty. v. State*, 270 Ga. 776, 512 S.E.2d 284 (1999) ..................... 35

*Fontana Water Co. v. City of Fontana*, 24 F.3d 246 (9th Cir. 1994) ...... 30

*Georgia Power Co. v. Roper*, 201 Ga. 760, 41 S.E.2d 226 (1947) ............ 24

*Glynn Cty. Bd. of Educ. v. Lane*, 261 Ga. 544,
  407 S.E.2d 754 (1991) ......................................................................... 32

*Houston v. Gilbert*, 5 S.C.L. 63 (S.C. Const. App. 1812) ......................... 21

*Howard v. Brantley County*, 260 Ga. App. 330, 332,
  579 S.E.2d 758 (2003) ......................................................... 3, 14, 15, 25

*INS v. Chadha*, 462 U.S. 919 (1983) ........................................................ 30

*Kamplain v. Curry Cty. Bd. of Comm'rs*,
  159 F.3d 1248 (10th Cir. 1998) ........................................................... 32

*Lacorte v. Hudacs*, 884 F.Supp. 64 (N.D.N.Y. 1995) ............................. 32

*Landgraf v. USI Film Prod.*, 511 U.S. 244 (1994) .................................. 35

*Lathrop v. Deal*, 301 Ga. 408, 801 S.E.2d 867 (2017) ............................ 16

*M & F Supermarket, Inc. v. Owens*,
  997 F. Supp. 908 (S.D. Ohio 1997). ................................................... 37

*Malcom v. Webb*, 211 Ga. 449, 86 S.E.2d 489 (1955) ........................ 21, 36

*McGroarty v. Swearingen*, 977 F.3d 1302 (11th Cir. 2020) .................... 12

*McInerney v. McInerney*, 313 Ga. 462, 870 S.E.2d 721 (2022) .............. 28

*Miller v. State of New York*, 82 U.S. 478 (1872) ..................................... 22

*Montgomery County v. Sharpe*, 261 Ga. App. 389,
  582 S.E.2d 545, 547 (Ga. Ct. App. 2003) ............................................. 3

*Murray Cty. Sch. Dist. v. Adams*, 218 Ga. App. 220,
  461 S.E.2d 228 (1995) ......................................................................... 30

## TABLE OF AUTHORITIES
### (continued)

*New Orleans Waterworks Co. v. Louisiana Sugar Ref. Co.*
  125 U.S. 18 (1888) ................................................................. 30

*Newport & C. Bridge Co. v. United States*, 105 U.S. 470 (1881) ............ 22

*Nikas v. Hindley*, 98 Ga. App. 437, 106 S.E.2d 335 (1958) .................... 27

*Oil States Energy Services, LLC v. Greene's Energy Group, LLC*,
  138 S. Ct. 1365 (2018) ............................................................ 22

*Prentis v. Atl. Coast Line Co.*, 211 U.S. 210 (1908) ............................... 31

*Pritchard v. Savannah St. & R. R. Co.*, 87 Ga. 294,
  13 S.E. 493 (1891) .................................................................. 36

*Provisional Municipality of Pensacola v. Lehman*,
  57 F. 324 (5th Cir. 1893) ......................................................... 27

*Romines v. Great-W. Life Assur. Co.*, 865 F. Supp. 607
  (E.D. Mo. 1994), *aff'd*, 73 F.3d 1457 (8th Cir. 1996) ....................... 36

*Ross v. State of Oregon*, 227 U.S. 150 (1913) .............................. 30, 35

*Rush v. Fed. Deposit Ins. Corp.*, 747 F. Supp. 575 (N.D. Cal. 1990) ...... 36

*S. States-Bartow Cty., Inc. v. Riverwood Farm Homeowners Ass'n*,
  300 Ga. 609, 797 S.E.2d 468 (2017) .......................................... 30

*Satterfield v. Southern Regional Health Care Sys.*,
  280 Ga. App. 584, 634 S.E.2d 530 (2006) .................................. 36

*Sexton v. Sewell*, 351 Ga. App. 273, 830 S.E.2d 605 (2019) ................. 27

*Slosberg v. Giller*, 314 Ga. 89, 876 S.E.2d 228 (2022) ........................ 23

*Smith v. Lomax*, 45 F.3d 402 (11th Cir. 1995) .................................. 31

*State of New Jersey v. Yard*, 95 U.S. 104 (1877) ................................ 21

*State v. SASS Grp., LLC*, 315 Ga. 893, 885 S.E.2d 761 (2023) ............. 16

*Thomason v. Phillips*, 73 Ga. 140 (1884) ........................................ 23

# TABLE OF AUTHORITIES
## (continued)

*Three Rivers Cablevision, Inc. v. City of Pittsburgh*,
  502 F. Supp. 1118 (W.D.Pa. 1980)......................................................32

*Trustees of Dartmouth College v. Woodward*, 17 U.S. 518 (1819)..........22

*United States v. Chen*, 821 F. Supp. 2d 454 (D. Mass. 2011) .................36

*Woodward v. City of Lithonia*, 191 Ga. 234, 11 S.E.2d 476 (1940) ........29

*Zabriskie v. Hackensack & N.Y.R. Co.*,
  18 N.J. Eq. 178, 186 (Ch. 1867) ..........................................................21

**Statutes**

28 U.S.C. § 1291 ......................................................................................ix

28 U.S.C. § 1332(a) .................................................................................ix

O.C.G.A. § 13-1-13.................................................................................38

O.C.G.A. § 13-4-60.................................................................................24

O.C.G.A. § 45–6–5 .................................................................................21

**Other Authorities**

23 Williston on Contracts § 63:57 (4th ed.)............................................27

25 C.J. *Ferries* § 16 (1921).......................................................................22

5 Williston on Contracts § 9:15 (4th ed.) ..........................................23, 24

Caleb Nelson, *Vested Rights, "Franchises," and the Separation of
  Powers*, 169 U. PA. L. REV. 1429 (2021) ...............................................22

Daniel F. Hinkel, *Pindar's Georgia Real Estate Law and
  Procedure with Forms* § 19:16. (7th ed., Apr. 2022 update) ...............23

Nels Peterson, *Principles of Georgia Constitutional Interpretation*,
  75 MERCER L. REV. 1 (2023) ...........................................................16, 17

R. Perry Sentell, Jr., *The Georgia Home Rule System*, 50 MERCER
  L. REV. 99 (1998) ................................................................................18

# TABLE OF AUTHORITIES
## (continued)

*Repeal*, Oxford English Dictionary (online ed. 2023) ...................... 19, 26

*Repeal*, Webster's New International Dictionary of the English
    Language (1913 ed.) ................................................................ 19

*Rescind*, Black's Law Dictionary (11th ed. 2019) ................................... 19

Restatement (Second) of Contracts § 256 ............................................. 28

Restatement (Second) of Contracts § 371 ............................................. 25

Restatement (Second) of Contracts § 376 ............................................. 25

*Void Contract*, Black's Law Dictionary (11th ed. 2019) ....................... 23

## Constitutional Provisions

Ga. Const. art. I, § 1, ¶ X ................................................................ 29

Ga. Const. art. I, § 2, ¶ I ................................................................. 17

Ga. Const. art. IX, § 2, ¶ 1 ................................................ i, 7, 18, 19, 24

Ga. Const. of 1777, Preamble ............................................................ 17

## JURISDICTION

The district court had jurisdiction over this case under 28 U.S.C. § 1332(a) because the sum in controversy exceeds $75,000 and there is complete diversity of citizenship between Camden County, a political subdivision of the State of Georgia, and Union Carbide Corp., a New York Corporation.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because it is an appeal from a final order dismissing Appellant's Complaint and all of its claims on October 12, 2023. Appellant timely filed a notice of appeal on November 9, 2023.

## STATEMENT OF ISSUES

1. Whether a legal contract still exists where the voters' repealed the County's authorization to enter into the contract in the first place.

2. Whether the voters' repeal of a specific and voidable contract's underlying authorization through public referendum implicates the Georgia Constitution's Contracts Clause.

## INTRODUCTION

The Georgia Constitution empowers voters to "repeal" actions taken by their elected county officials—including their approval of public contracts—through referenda. In a 2022 referendum, the public exercised that right and voted to repeal the Camden County Board of Commissioners' authorization of a public contract to purchase land. The County sued to recover $2.64 million paid under that now-voided contract.

The district court, however, dismissed the Complaint, holding that the Option Agreement remained a "legal contract," despite the referendum's "repeal" of the underlying authorization for the contract. According to the district court, the referendum prevented the County from enforcing its contractual rights, but the County was also barred from recovering taxpayer dollars under a theory of unjust enrichment because a "legal contract" still existed. ECF 75 at 21–22. As a result of the district court's internally inconsistent ruling, the County is without a remedy for breach of contract *or* unjust enrichment, thereby allowing Union Carbide to have its cake and eat it, too—*i.e.*, Union Carbide retains the entirety of $2.64 million in taxpayer funds without having to perform its remaining contractual obligations.

The incongruous result of the district court's opinion cannot stand and must be reversed. Following the referendum and the decision of the Georgia Supreme Court affirming its constitutionality, there no longer

exists any "legal contract" that would preclude the County's claim for unjust enrichment or money had and received. By the express terms of the referendum, as approved by the voters, the resolution of the Board of Commissioners that authorized the Option Agreement in the first place has been "repealed." ECF 58 ¶ 12; ECF 75 at 4. The referendum, therefore, did not simply repudiate or terminate an otherwise validly existing contract; it rescinded and revoked its underlying authority, thereby rendering it void and illegal.

As a matter of Georgia law, where public funds are paid without authorization, "it is proper for the county to bring a suit for the recovery of same." *Howard v. Brantley County*, 260 Ga. App. 330, 332, 579 S.E.2d 758 (2003) (citing *Burke v. Wheeler County*, 54 Ga. App. 81, 187 S.E. 246 (1936)). The district court likewise acknowledged that the County is entitled "to recover funds that were paid pursuant to an illegal or void contract." ECF 75 at 24 (citing *Montgomery County v. Sharpe*, 261 Ga. App. 389, 582 S.E.2d 545, 547 (Ga. Ct. App. 2003)). Because the referendum "repealed" the resolutions authorizing the Option Agreement, the payments by the County to Union Carbide lacked authorization, thereby entitling the County to recover those funds.

At a minimum, the weighing of equities is not proper for resolution on a motion to dismiss. Contrary to the district court's findings, Union Carbide is not entitled as a matter of law to retain $2.64 million in taxpayer funds simply "by keeping the Property off the

market for multiple years." ECF 75 at 22. As a result of the referendum, Union Carbide is no longer required to sell the Property to the County at the agreed-upon price or honor the $2.1 million credit to which the County would have been entitled under the Option Agreement. Unless the district court's holding is reversed, Union Carbide gets to keep the Property *and* $2.64 million in taxpayer dollars, while the County is left holding the proverbial bag. This is the very definition of unjust enrichment, which the County is entitled to pursue in the absence of a legal contract.

## STATEMENT OF THE CASE

### I. The Board of Commissioners authorizes the Option Agreement with Union Carbide.

Once considered by NASA as a potential launch site for the Apollo program in the 1960s, Camden County has long been considered an ideal location from which to launch rockets.[1] As private commercial space travel dramatically increased in the 21st century, the Camden County Board of Commissioners (the "Board") began looking at potential economic opportunities presented by its location, specifically the development of a spaceport to facilitate commercial space activity.

---

[1] *E.g.*, Dan Chapman, *Camden County sky high on spaceport plan, but others want it grounded*, ATLANTA JOURNAL-CONSTITUTION (July 30, 2015) (available at https://www.ajc.com/news/state--regional-govt--politics/camden-county-sky-high-spaceport-plan-but-others-want-grounded/LbCTP6hjOfd0AhGuFCxJ1O/).

One of the most important pieces to the project was identifying and purchasing the land necessary on which to build the facility. The County eventually identified what it believed to be an ideal property: an approximately 4,000-acre tract located in Woodbine, Georgia and owned by Appellee Union Carbide (the "Property"). ECF 58 ¶ 4; ECF 67-1 at 1–3.[2] The Property had previously been owned by various entities and used for a variety of industrial purposes. Of particular interest to the Board, the site had been previously owned by Thiokol and used to test rockets.[3] Thus, it already had some infrastructure necessary to begin the process of building the spaceport. But its prior uses also meant that the Property suffered from a number of hazards and limitations, including areas of surface and subsurface munitions, a closed hazardous waste landfill, federally protected wetlands, and areas subject to U.S. Army Corps of Engineers jurisdiction. ECF 67-1 at 1–3. Nevertheless, despite these limitations, the Board thought that the Property was ideal for the spaceport project, and it began negotiating with Union Carbide on an agreement to purchase the Property.

In 2015, the Board and Union Carbide reached an agreement that

---

[2] Pursuant to Fed. R. App. P. 28-5, references to the record shall be to the docket and page numbers assigned by the district court, unless otherwise noted.

[3] *See generally* Camden County, *Spaceport Camden Records*, https://www.camdencountyga.gov/1286/Spaceport-Camden-Records (last visited Feb. 6, 2024).

would provide the County the ability to purchase the Property (the "Option Agreement") for a total purchase price of $4.8 million. ECF 67-1 at 6. The County did not purchase the Property outright because the spaceport project was under review (and subject to approval) by the Federal Aviation Administration ("FAA"). ECF 58 at 2. Rather, the Option Agreement provided a two-year option for the County to purchase the Property in exchange for $960,000 plus any taxes which were owed on the Property during the option period. *Id.* ¶ 5; ECF 67-1 at 5. These payments would eventually be credited toward the purchase price. *Id.* at 6. The Option Agreement also provided the County the option of extending the option period for an additional year in exchange for an additional $720,000.00, which would also be credited towards the purchase price. *Id.* at 4–5.

On June 3, 2015, the Board approved a resolution authorizing the County to enter into the Option Agreement with Union Carbide to purchase the Property (the "Initial Resolution"). ECF 67-2 at 1. The Board and Union Carbide extended the option period on multiple occasions in the years that followed in exchange for additional advances towards the purchase price. ECF 58 ¶ 6; ECF 67-3–67-6. Like the Initial Resolution, these extensions were authorized by the Board through resolutions (together with the Initial Resolution, the "Board Resolutions").

Ultimately, the option period was extended to April 23, 2022, with

the County having paid Union Carbide $2,640,000. ECF 58 ¶¶ 7–8. From the total amount paid by the County, $2,115,000 was to be applied as a credit toward the final purchase price. *Id.*

## II. Camden County voters repeal the Board Resolutions that authorized the Option Agreement.

From the beginning, the spaceport project was controversial among voters.[4] In December 2021—just one week before the FAA approved the project—two Camden County voters filed a petition in the Camden County Probate Court pursuant to the "Home Rule Paragraph" of the Georgia Constitution seeking to reject the Board's authorization of the Option Agreement. Ga. Const. art. IX, § 2, ¶ 1; ECF 58 ¶¶ 10–11. Specifically, the voters sought to repeal the Resolutions purporting to authorize the Option Agreement. *Id.* The Probate Court sanctioned the petition and called for a special election to be held on March 8, 2022 (the "Referendum") on the following question:

> Shall the resolutions of the Board of Commissioners of Camden County, Georgia authorizing the Option Contract with Union Carbide Corporation and Camden County's right and option to purchase the property described therein be repealed.

---

[4] *E.g.*, Dan Chapman, *Camden County sky high on spaceport plan, but others want it grounded*, ATLANTA JOURNAL-CONSTITUTION (July 30, 2015) (available at https://www.ajc.com/news/state--regional-govt--politics/camden-county-sky-high-spaceport-plan-but-others-want-grounded/LbCTP6hjOfd0AhGuFCxJ1O/).

ECF 58 ¶ 12. In response, the County filed suit in Camden County Superior Court seeking to enjoin the Referendum on the grounds that it exceeded the authority granted to voters in the Home Rule Paragraph. *Id.* ¶ 13. On March 4, 2022, the Superior Court denied the County's request and allowed the Referendum to go forward. *Id.* ¶ 14.

On March 8, 2022, the Referendum passed, with over 72% of voters voting to repeal the resolutions authorizing the Option Agreement. *Id.* ¶ 15 (4,169 voting in favor to 1,613 opposed).

## III. Camden County challenges the constitutionality of the referendum and initiates this lawsuit to enforce the contract.

The same day that the Referendum passed, the County appealed the Superior Court's decision upholding the Referendum's constitutionality to the Georgia Supreme Court. *Id.* ¶ 16. But in the meantime, the deadline for exercising the option was fast approaching and set to expire on April 23, 2022. The County sought Union Carbide's assistance to protect the parties' agreement and the taxpayer money that had already been paid out. *Id.* ¶ 18. Specifically, the County attempted to exercise the option and purchase the Property. ECF 58 ¶ 19; ECF 53-1 ¶¶ 29–50. But after an extended series of correspondence, it became apparent that Union Carbide no longer believed it had any obligations under the Option Agreement and that it nevertheless intended to pocket the payments made by the County. *Id.*

– 8 –

In particular, Union Carbide claimed that the Referendum "repudiated the Agreement," that the County had therefore "rescinded the Option Agreement," and that there was thus "no longer an Option for the County to exercise." ECF 53-8 at 1; *see also* ECF 53-10.

In order to preserve the County's rights and protect taxpayer money, the County filed this lawsuit on July 27, 2022. In its original complaint, the County included claims for breach of contract, as well as an alternative claim for unjust enrichment to recover the funds paid out under the Option Agreement in the event the Georgia Supreme Court allowed the Referendum to stand. ECF 53-1 at 16–23.

On September 27, 2022, Union Carbide filed a motion to dismiss the original complaint. ECF 18. The parties fully briefed that motion, and the district court heard oral argument on the motion on January 17, 2023. ECF 18, 27, 34, 45.

## IV. The Georgia Supreme Court affirms the constitutionality of the Referendum.

On February 7, 2023, while the motion to dismiss was pending, the Georgia Supreme Court issued its opinion affirming the Referendum's constitutionality. *See Camden Cty. v. Sweatt*, 315 Ga. 498, 883 S.E.2d 827 (2023). At issue in that case was whether the electorate's referendum power under the Home Rule Paragraph was limited to "local acts applicable to its governing authority," or whether it could extend to all measures adopted by the governing authority. *Id.*

at 506–07. After analyzing the Home Rule Paragraph's text, the Georgia Supreme Court found in favor of the latter interpretation. *Id.* at 510. Accordingly, the Referendum was a valid exercise of the electorate's power and properly "repealed" the Board Resolutions that authorized the Option Agreement.

## V.  The District Court dismisses the County's Amended Complaint.

In light of the Georgia Supreme Court's decision in *Sweatt* affirming the Referendum's constitutionality, the County filed an Amended Complaint in this case on April 17, 2023 which maintained its claim for unjust enrichment and/or money-had-and-received to recover the funds that the County had already paid under the Option Agreement ECF 58. On May 1, 2023, Union Carbide moved to dismiss the Amended Complaint. ECF 67. The parties fully briefed the motion, and it was submitted to the district court without oral argument. ECF 67, 68, 72.

On October 12, 2023, the district court granted Union Carbide's motion and dismissed the Amended Complaint. ECF 75. The district court reasoned that the Option Agreement was valid and legally enforceable because "the Board legally entered into the Option Agreement with Defendant Union Carbide" and "did not exceed its legislative authority" in doing so. *Id.* at 16, 18. Thus, the district court held, the Option Agreement was valid at the time it was executed. *Id.*

at 13.

When it came to the Referendum, the district court said that it "must be construed to have operation on future transactions only," meaning that it "prohibited the Board from exercising the option under the contract." *Id.* at 21–22. But the Referendum could not "retroactively strip the County of its authority to enter into the Option Agreement in the first place," the district court reasoned, because doing so "would impair the contractual obligations of the Option Agreement that were lawfully made pursuant to existing law" and violate the Georgia Constitution's Contracts Clause. *Id.* at 20–21. For the district court, the "resolutions in effect at the time the Option Agreement was executed"— *i.e.*, the Board Resolutions—"must remain part of the contract," even though the voters approved a Referendum that expressly "repealed" those resolutions. *Id.* at 21. Thus, because "the Board did not exceed its authority in entering the Option Agreement, and the Referendum did not retroactively prevent the County from executing the contract," the district court held that "the Option Agreement is a legal contract" and dismissed the County's claims for unjust enrichment and money had and received. *Id.* at 22.

The district court also dismissed the County's claims on the alternative ground that the voluntary-payment doctrine barred the County's claims. The district court acknowledged that "[t]he voluntary payments doctrine does not preclude recovery when a county attempts

– 11 –

to recover funds that were paid pursuant to an illegal or void contract." *Id.* at 24. But because the district court previously found that the Option Agreement was a valid agreement, the district court found that the doctrine applied in this case. *Id.* at 24–25.

On November 9, 2023, the Board timely filed its Notice of Appeal.

## VI. Standard of review.

This Court "review[s] de novo the district court's grant of a motion to dismiss under Fed. R. Civ. Pro. 12(b)(6) for failure to state a claim, accepting the factual allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *McGroarty v. Swearingen*, 977 F.3d 1302, 1306 (11th Cir. 2020) (quotations omitted).

## SUMMARY OF THE ARGUMENT

The district court held that "the County's claims for unjust enrichment and for money had and received fail" because "the Option Agreement is a legal contract." ECF 75 at 22. Notwithstanding the "repeal" of the Board Resolutions, the district court nonetheless determined that "[t]he resolutions in effect at the time the Option Agreement was executed *must remain a part of the contract.*" ECF 75 at 21 (emphasis added). But despite finding that a "legal contract" existed which obligated the County, the district court also held that the Referendum "prohibit[s] the Board from exercising the option under the

– 12 –

contract," thus excusing Union Carbide from its obligations. ECF 75 at 21-22. The effect of the district court's order is to treat the Referendum as a repudiation or termination of an otherwise "legal contract," thereby depriving the County of any remedy. The district court's holding is erroneous for the following reasons and requires reversal.

*First*, the Referendum did not repudiate or terminate the contract—it voided it. With the Home Rule Paragraph, the people reserved for themselves the right to "repeal" specific actions taken by their local elected officials, meaning the ability to "revoke" or "rescind" such actions, rendering the repealed action null and void. This effective veto power extends to county officials' approval of public contracts and is read into every county contract. This means that county contracts are voidable under certain limited circumstances. And when the public exercises that right with respect to a public contract—which the Georgia Supreme Court has said they have the right to do—then that contract lacks the authorization required by law and is void, and any funds paid under that contract may be recovered by the public.

*Second*, contrary to the district court's opinion, the Referendum does not implicate the Georgia Constitution's Contracts Clause. The Contracts Clause only applies to legislative acts and only protects vested rights. The Resolutions and the Referendum, however, were administrative or executive in nature, not legislative. Moreover, Union Carbide did not have any vested rights in the Option Agreement. The

possibility of a referendum was built into the contract, making Union Carbide's rights subject to disaffirmance by the public. Thus, the Contracts Clause does not apply.

*Third*, the district court erred when it said the voluntary-payment doctrine barred the County's claims. The voluntary-payment doctrine is inapplicable here because the Option Agreement is void. As recognized by the district court, "the voluntary payment doctrine does not preclude a recovery when a county attempts to recover funds that were paid pursuant to an illegal or void contract." ECF 75 at 24 (citing cases).

Taken together, these errors require the reversal of the district court's dismissal of Camden County's claim. In the absence of a legal contract, the County is authorized to recover funds paid to Union Carbide without authorization and, therefore, has stated a claim for unjust enrichment and/or money-had-and-received. *Burke*, 54 Ga. App. at 81 ("Where public funds are illegally paid out by county officials or agency, county may bring suit for recovery thereof[.]"); *Howard*, 260 Ga. App. at 332 (same).

## ARGUMENT

## I. The Referendum voided the Option Agreement by "repealing" the Board Resolutions that authorized it.

The County brought this lawsuit to recover $2.64 million in public funds which were paid under a contract that was later repealed by the electorate via the Referendum. The first question presented by this case

is whether the voters' repeal of the County's specific underlying authorization to enter into the contract rendered the contract void. The answer is undoubtedly yes.

It is undisputed that Georgia law treats unauthorized public contracts as "ultra vires," not binding, and as if the public "never entered [them] at all." *City of Baldwin v. Woodard & Curran, Inc.*, 293 Ga. 19, 29, 743 S.E.2d 381 (2013). And there is no question that the public may sue to recover taxpayer funds which have been unlawfully paid out under an unauthorized contract. ECF 75 at 24; *see also*; *Howard*, 260 Ga. App. at 332. Yet, the district court dismissed the County's claim, finding that because the Option Agreement was lawful at the time it was entered into, the Option Agreement remains a "legal contract" notwithstanding the outcome of the Referendum, which was affirmed by the Georgia Supreme Court. ECF 75 at 22. This was error.

Though the application of the Home Rule Paragraph's repeal referendum provision to a public contract appears to present a question of first impression under Georgia law, the text, structure, and history of the Georgia Constitution—as well as other historical analogues—demonstrates that the voters' "repeal" of the Option Agreement's underlying authorization rendered the Option Agreement void. In the absence of a legal contract, the County has stated a claim for unjust enrichment and/or money-had-and-received.

### A. The Home Rule Paragraph empowers voters to revoke or rescind the actions of elected county officials and render them void.

Through the 2022 Referendum, Camden County voters exercised their constitutional right to "repeal" the Option Agreement's underlying authorization. Any analysis of the Referendum's effect must therefore begin with the Home Rule Paragraph's use of the word "repeal." Here, the text, history, and structure of the Home Rule Paragraph demonstrates that when voters exercise their right to "repeal" the actions of their elected county officials, they "revoke" or "rescind" such actions, rendering them null and void.

"When Georgia courts 'inquire into the meaning of a constitutional provision, they look to its text, and their object is to ascertain the meaning of the text at the time it was adopted.'" Nels Peterson, *Principles of Georgia Constitutional Interpretation*, 75 MERCER L. REV. 1 (2023) (quoting *Lathrop v. Deal*, 301 Ga. 408, 428, 801 S.E.2d 867 (2017)) (cleaned up). Because constitutions "are the result of popular will," their words must be interpreted "ordinarily in the sense they convey to the popular mind." *Clarke v. Johnson*, 199 Ga. 163, 164, 33 S.E.2d 425 (1945).

One familiar place to look for ordinary meaning, of course, is a dictionary. *State v. SASS Grp., LLC*, 315 Ga. 893, 898, 885 S.E.2d 761 (2023). But other contextual sources are equally, if not more, important. These include the provision's grammar, punctuation, and structure, the

historical context of its adoption, as well as other examples of historical usage of particular terms. *City of Guyton v. Barrow*, 305 Ga. 799, 804, 828 S.E.2d 366 (2019); *see also* Peterson, *supra* p. 16 at 43–52 (identifying various sources of contextual evidence for discerning ordinary meaning).

Under Georgia law, "all power and authority is vested in the sovereign people, subject only to such limitations as they have expressly imposed upon themselves by … the constitution." *Wheeler v. Bd. of Trustees of Fargo Consol. Sch. Dist.*, 200 Ga. 323, 331, 37 S.E.2d 322 (1946). That's because, as the Georgia Constitution has made clear from the State's founding, "[a]ll government, of right, originates with the people, [and] is founded upon their will only[.]" Ga. Const. art. I, § 2, ¶ I; *see also* Ga. Const. of 1777, Preamble ("We therefore the representatives of the people, *from whom all power originates*[.]") (emphasis added).[5] Rather than exercise their power directly, the people have largely chosen to delegate their sovereign authority to elected representatives to act in their name. Ga. Const. art. I, § 2, ¶ I ("Public officers are the trustees and servants of the people and are at all times amenable to them."); *see also* Ga. Const. of 1777, Preamble ("We therefore the representatives of the people … by virtue of the power *delegated to*

---

[5] Copies of pre-1983 Georgia Constitutions may be found at the website for the Georgia Archives, available at available at https://vault.georgiaarchives.org/digital/collection/adhoc/search.

*us*[.]") (emphasis added). Historically, Georgians vested that power in the hands of the General Assembly, which enjoyed plenary legislative power, even over local decisions. *Camden Cty. v. Sweatt*, 315 Ga. 498, 506, 883 S.E.2d 827, 835 (2023); *DeKalb Cty. Sch. Dist. v. Georgia State Bd. of Educ.*, 294 Ga. 349, 352, 751 S.E.2d 827 (2013).

But in 1966, Georgians provided two important caveats to that power. After a long history of resistance to home rule, Georgians adopted the Home Rule Paragraph, placing control over decisions affecting local government in the hands of local elected officials. *See* Ga. Const. art. IX, § 2, ¶ 1; *see also* R. Perry Sentell, Jr., *The Georgia Home Rule System*, 50 MERCER L. REV. 99, 105 (1998) (providing a history of Georgia's home rule system). Whereas the people had previously given the General Assembly "plenary power over local government," *Sweatt*, 315 Ga. at 506, they now expressly assigned powers over certain local matters to the "governing authority of each county[.]" Ga. Const. art. IX, § 2, ¶ I. These included the "power to adopt clearly reasonable ordinances, resolutions, or regulations relating to its property, affairs, and local government[.]" *Id.* And the General Assembly could no longer "repeal, modify, or supersede" such actions except in certain limited, enumerated circumstances. *Id.*

The Home Rule Paragraph, however, did not just shift authority from one set of elected officials to another. It also included a new provision allowing the people themselves to hold a referendum on

specific acts taken by their county officials. *See* Ga. Const. Art. IX, § 2, ¶ 1(b)(2). Through the Home Rule Paragraph, the public is no longer limited to only indirectly expressing their will through the Constitution and their elected officials; they can now *directly* express their will on specific issues. In other words, the people—as the ultimate sovereign authority from whom all governmental power originates—took back a measure of their right to govern themselves through the ability to effectively veto actions taken by their county officials.

Specifically, voters now enjoyed the power to "repeal … ordinances, resolutions, or regulations adopted" by the County governing authority. *Id.* The word which stands at the center of this case—"repeal"—has long meant the revocation or rescission of an earlier action. The Oxford English Dictionary, for example, defines the word as to "revoke or rescind (something previously determined or set)," a definition which has been in use since at least 1425 through the present. *Repeal*, Oxford English Dictionary (online ed. 2023). Webster's 1913 edition defines it as "to rescind or abrogate by authority[.]" *Repeal*, Webster's New International Dictionary of the English Language (1913 ed.). Black's similarly suggests "repeal" and "rescind" as synonyms. *Rescind*, Black's Law Dictionary (11th ed. 2019) ("2. To make void; to repeal or annul. 3. To void, repeal, or nullify a main motion adopted earlier."). And when one "rescinds" an action, it makes that action null and "void." *Id.*

Thus, the text, history, and structure of the Home Rule Paragraph demonstrates that when voters exercise their right to "repeal" the actions of their elected county officials, they "revoke" or "rescind" such actions, rendering them null and void.

### B. The Option Agreement was voidable and subject to revocation by popular referendum.

With the people's constitutional right to nullify the actions of county officials firmly in place, the Option Agreement must be viewed as a voidable contract that was subject to disaffirmance and rescission by popular referendum.

In *Sweatt*, the Georgia Supreme Court made clear that the repeal-referendum provision of the Home Rule Paragraph applies as equally to Board-approved contracts as it does to other exercises of the Board's governing authority. 315 Ga. at 508–11. Having first appeared in the Georgia Constitution in 1966—long before the Option Agreement was executed—the people's right to veto actions taken by county officials was incorporated into the Option Agreement. As the district court acknowledged, "laws in existence at the time a contract is executed are part of that contract." ECF 75 at 19 (quoting *Busbee v. Ga. Conf., Am. Ass'n of Univ. Professors*, 235 Ga. 752, 760, 221 S.E.2d 437 (1975) *overruled on other grds. by Self v. City of Atlanta*, 259 Ga. 78, 377 S.E.2d 674 (1989)); *see also infra* at 21–22 (reserve-clause cases). Thus, the possibility (however remote) that the people might rescind the

Option Agreement was always part of the contract, making it voidable. *See Malcom v. Webb*, 211 Ga. 449, 456, 86 S.E.2d 489 (1955) *(*"Persons dealing with a public officer must take notice of the extent of his powers at their peril."); *see also* O.C.G.A. § 45–6–5 ("[p]owers of all public officers are defined by law and all persons must take notice thereof. The public may not be estopped by the acts of any officer done in the exercise of an unconferred power.").

While this case presents the public's first known exercise of this power, the concept that a once-enforceable contract might later be rescinded is not novel. There are many historic cases across the country which have discussed the "repeal" or "revocation" of contracts, particularly those with public entities. *See, e.g.*, *Citizens' Sav. Bank v. City of Owensboro*, 173 U.S. 636, 644 (1899) (discussing "revocable" and "irrevocable" contracts and whether a contract was "subject to repeal"); *State of New Jersey v. Yard*, 95 U.S. 104, 111 (1877) ("repealable" and "irrepealable" contracts); *Zabriskie v. Hackensack & N.Y.R. Co.*, 18 N.J. Eq. 178, 186 (Ch. 1867) ("The state was making what had been decided to be a contract, and it reserved the power of change, by altering, modifying, or repealing the contract."), *disapproved of by Brundage v. New Jersey Zinc Co.*, 48 N.J. 450, 467 (1967); *Houston v. Gilbert*, 5 S.C.L. 63, 67 (S.C. Const. App. 1812) ("The jury, therefore, had no power to repeal the contract").

Indeed, the late 19th century saw much debate and litigation over

– 21 –

questions about "repealable" and "irrepealable" contracts in the context of corporate charters. In *Trustees of Dartmouth College v. Woodward*, the Supreme Court held that private charters granted by the government constituted contracts which, "*unless a power be reserved for this purpose*," the government cannot "alter or amend." 17 U.S. 518, 675 (1819) (Story, J., concurring) (emphasis added). In the wake of that decision, state legislatures across the country began adopting "reserve clauses" in their constitutions and statutes which expressly reserved the right of the legislature to amend or revoke corporate charters. *See, e.g.*, Caleb Nelson, *Vested Rights, "Franchises," and the Separation of Powers*, 169 U. PA. L. REV. 1429, 1461–62 (2021). Ultimately, the Supreme Court upheld the constitutional validity of such reserve clauses and established the rule that "a general statute reserving the power to repeal, alter, or amend is, by implication, read into a subsequent charter, and prevents it from becoming irrevocable." *Citizens' Sav. Bank*, 173 U.S. at 644 (1899); *see also Miller v. State of New York*, 82 U.S. 478, 489 (1872).[6]

_____

[6] Courts have affirmed the validity of such reserve clauses in a wide variety of contexts beyond corporate charters. *See, e.g.*, *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 138 S. Ct. 1365, 1373 (2018) (patents); *Newport & C. Bridge Co. v. United States*, 105 U.S. 470, 481 (1881) (affirming modification of contract to build bridge over the Ohio River); *cf.* 25 C.J. *Ferries* § 16 (1921) ("A legislative grant of a ferry franchise without reservation, when duly accepted, is a contract between the grantee and the state which cannot be impaired

And for centuries, the common law has recognized that certain types of contracts are voidable, including for "lack of capacity, duress, fraud, and undue influence." *Slosberg v. Giller*, 314 Ga. 89, 96, 876 S.E.2d 228 (2022). These contracts are not automatically void but rather "voidable," a term which "connotes continuance in force until" it is disaffirmed. Daniel F. Hinkel, *Pindar's Georgia Real Estate Law and Procedure with Forms* § 19:16. (7th ed., Apr. 2022 update).[7] Whereas a "void contract" is a "contract that is of no legal effect, that there is really no contract in existence at all," a "voidable contract" is a contract that "can be affirmed or rejected at the option of one of the parties[.]" *Void Contract*, Black's Law Dictionary (11th ed. 2019). When one chooses to disaffirm a voidable contract, the transaction is rescinded and the parties are "restored to the[ir] original status as if no [contract] had taken place." 5 Williston on Contracts § 9:15 (4th ed.); *see also Thomason v. Phillips*, 73 Ga. 140, 140 (1884) (one must "either abide the [voidable] contract or disaffirm and rescind it").

Similar to these categories of contracts, county contracts like the Option Agreement are likewise voidable and capable of being rescinded

---

by subsequent legislation, except in so far as the right to do so has been reserved.").

[7] The Georgia Supreme Court cited this language favorably in describing the difference between a void and voidable agreement. *Slosberg*, 314 Ga. at 97 n.10.

by the public under the limited circumstances provided by the Home Rule Paragraph. Indeed, the concept that voidable contracts "continu[e] in force until" they are disaffirmed closely resembles the language in the Home Rule Paragraph, which states that resolutions adopted by the Board shall "continue in full force and effect *until* amended or repealed" pursuant to the repeal-referendum provision. Ga. Const. art. IX, § 2, ¶ I (emphasis added). The people having exercised that right of repeal, the Option Agreement was therefore transformed from a voidable contract to a voided one.

Union Carbide has argued that the fact that it "kept the Property off the market" between the time the Resolutions were adopted and the Referendum somehow changes the analysis. It does not. Under the plain terms of the Home Rule Paragraph and the Referendum, the Option Agreement was voided. The remedy for voided contract is rescission and restitution—to "restore" the parties "to the[ir] original status as if no [contract] had taken place." 5 Williston on Contracts § 9:15 (4th ed.); *see also, e.g.*, O.C.G.A. § 13-4-60 (parties must exchange value; *Georgia Power Co. v. Roper*, 201 Ga. 760, 762, 41 S.E.2d 226 (1947). To the extent that the County received a benefit under the Option Agreement—a questionable proposition—that it is now unable to disgorge either in part or in full, then that may be a consideration for

the court in defining the remedy.[8] *See, e.g.*, Restatement (Second) of Contracts §§ 371, 376 (identifying the measure of restitution interest where contract is voidable and possible offsets). But in all cases, the relative equities and value of any benefits conferred and retained is a fact question which does not affect the legal status of the contract and cannot be decided on a motion to dismiss.

In short, when Camden County voters voted to "repeal" the Option Agreement's underlying authorization through the Referendum, they revoked and rescinded the Board's authorization to enter into the contract. In so doing, the people disaffirmed the contract, rendering it null and void. The contract having been voided, the County was thereafter empowered to seek recovery of the $2.64 million that had been paid pursuant to the now-voided Option Agreement through a claim for unjust enrichment and/or money-had-and-received. *See Burke*, 54 Ga. App. at 81 ("Where public funds are illegally paid out by county officials or agency, county may bring suit for recovery thereof[.]"); *Howard*, 260 Ga. App. at 332 (same).

---

[8] The measure of consideration in a restitution case would not be the price in the contract, but rather the value of the benefit to the other party. *See Butts Cty. v. Jackson Banking Co.*, 129 Ga. 801, 60 S.E. 149 (1908) (value conferred in a void contract is "not what the claimant has parted with to officers who were not authorized to take his money for the town, or what they have promised him, but how much the town has benefited.").

## C. The district court's "repudiation" interpretation is inconsistent with the text and structure of the Home Rule Paragraph.

The district court, for its part, appears to have adopted Union Carbide's erroneous view that the Referendum merely repudiated an otherwise validly existing contract. ECF 75 at 22 (holding that the Option Agreement remained a "legal contract" following the Referendum). But this interpretation is inconsistent with the plain and ordinary meaning of "repeal" at the time the Home Rule Paragraph was adopted. While "repeal" has an historic alternative definition of "repudiate or renounce (one's actions)," the word was last used in this sense in 1792—nearly 200 years before the Home Rule Paragraph was enacted—and is considered obsolete. *Repeal*, Oxford English Dictionary (online ed. 2023).

In addition, "[i]t is a basic rule of construction that a statute [or constitutional provision] should be construed to make all its parts harmonize and to give a sensible and intelligent effect to each part, as it is not presumed that the [drafters] intended that any part would be without meaning." *Sweatt*, 315 Ga. at 509. To read the Referendum as a mere repudiation of the Option Agreement would render the public's right to a referendum completely meaningless.

A repudiation, for example, would not eliminate the public's obligations under the contract either prospectively *or* retrospectively. Only slight changes in the facts of this case highlight the problem.

– 26 –

Suppose the Referendum occurred after the Board elected to exercise the option but before the parties closed on the Property. Or consider if the parties' roles were reversed and it was Union Carbide who had the option to purchase County property—say, a centuries-old courthouse—to redevelop it for private purposes under an agreement which, like here, was repealed by the electorate before Union Carbide exercised the option. This referendum-as-repudiation theory would still obligate the County to honor the contract, notwithstanding overwhelming public opposition expressed through a constitutional referendum. If that were the case, Union Carbide might be able to sue for specific performance to force the purchase or sale. *Sexton v. Sewell*, 351 Ga. App. 273, 282, 830 S.E.2d 605 (2019) ("specific performance is an available remedy for the breach of a contract for the sale of real property"); *see also Provisional Municipality of Pensacola v. Lehman*, 57 F. 324, 332 (5th Cir. 1893) (public property may be subject to specific performance). At a minimum, Union Carbide could sue for damages. In either case, the Referendum would have been nothing more than an expensive straw poll.

Moreover, repudiations can be retracted. *See Nikas v. Hindley*, 98 Ga. App. 437, 441, 106 S.E.2d 335 (1958) (a non-repudiating party may be excused from performance "unless the repudiating party withdraws his repudiation before a change of position by the injured party makes his performance more burdensome"); 23 Williston on Contracts § 63:57 (4th ed.) ("[a]n effective retraction will nullify the effects of the

repudiation of a contact."); Restatement (Second) of Contracts § 256 (1981) (a repudiation "is nullified by a retraction of the statement"). As soon as the Referendum repealed the Resolutions, the Board could just as quickly pass a new resolution once again authorizing the Option Agreement. This would put the Commissioners above the reach of the public's review and essentially nullify the Referendum entirely.

If the public's constitutional right to a referendum encompasses the right to review and repeal the Board's authorization of contracts—as the Georgia Supreme Court has said it does—then that right must carry some consequence with it. *Sweatt*, 315 Ga. at 511; *McInerney v. McInerney*, 313 Ga. 462, 465, 870 S.E.2d 721 (2022) ("This Court must construe the Georgia Constitution to make its parts harmonize and to give sensible meaning to each of them.") (quotations omitted). The repudiation interpretation adopted by the district court is not only inconsistent with the plain and ordinary meaning of the word "repeal," but it also saps all meaning from the Referendum, making it a pointless exercise in futility.

## II. Georgia's Contract Clause does not negate the voters' approval of a referendum that "repealed" the Board Resolutions that authorized the Option Agreements.

The district court also erred when it found that the Referendum could not void the Option Agreement because doing so would implicate the Georgia Constitution's Contracts clause. ECF 75 at 19–22. Georgia's

Contracts Clause states that "[n]o bill of attainder, ex post facto law, retroactive law, or laws impairing the obligation of contract or making irrevocable grant of special privileges or immunities shall be passed." Ga. Const. art. I, § 1, ¶ X.[9] Although this language "appears absolute and unequivocal," the Georgia Supreme Court has held for over 85 years that the Contracts Clause "'forbids the passage of only those retroactive, or rather retrospective, *laws* which injuriously affect the *vested* rights of citizens[.]'" *Deal v. Coleman*, 294 Ga. 170, 176 n.13, 751 S.E.2d 337 (2013) (emphasis added) (quoting *Bullard v. Holman*, 184 Ga. 788, 791–92(2), 193 S.E. 586 (1937)). Contrary to the district court's opinion, the Contracts Clause is not implicated here.

### 1. Neither the Board Resolutions nor the Referendum were legislative acts.

*First*, neither the Resolutions nor the Referendum were legislative acts encompassed by the Contracts Clause. The Georgia Constitution, like the federal Contracts clause, prohibits only "*legislative* exercise[s] of the police power that result[ ] in the passage of retrospective laws which injuriously affect the 'vested rights' of citizens." *S. States-Bartow*

---

[9] Because of their nearly identical text, Georgia courts have interpreted the contracts clauses of the federal and Georgia constitutions together. *See City of Atlanta v. Airways Parking Co.*, 225 Ga. 173, 176, 167 S.E.2d 145 (1969); *Woodward v. City of Lithonia*, 191 Ga. 234, 234, 11 S.E.2d 476 (1940)

*Cty., Inc. v. Riverwood Farm Homeowners Ass'n*, 300 Ga. 609, 611, 797 S.E.2d 468 (2017) (emphasis added); *cf. Murray Cty. Sch. Dist. v. Adams*, 218 Ga. App. 220, 222, 461 S.E.2d 228 (1995) ("Assuming, without deciding, that the Board's action was a legislative rather than an executive action," and finding that it did not implicate the Contracts Clause). It "is aimed at the legislative power of the state, and not at the decisions of its courts, or the acts of administrative or executive boards or officers, or the doings of corporations or individuals.'" *Ross v. State of Oregon*, 227 U.S. 150, 162 (1913) (quoting *New Orleans Waterworks Co. v. Louisiana Sugar Ref. Co.* 125 U.S. 18, 30 (1888)). Thus, to implicate the Contracts Clause, "not only must the obligation of a contract have been impaired, but it must have been impaired by a *law* of the state," as opposed to some exercise of executive or judicial power. *New Orleans Waterworks*, 125 U.S. at 30 (emphasis added); *see also Fontana Water Co. v. City of Fontana*, 24 F.3d 246 (9th Cir. 1994) ("executive decisions with respect to how to implement [the] laws are not controlled by the Contract Clause.").

Determining whether governmental actions are "an exercise of legislative power" so as to come within the scope of the Contracts Clause "depends not on their form but upon whether they contain matter which is properly to be regarded as legislative in its character and effect." *INS v. Chadha*, 462 U.S. 919, 952 (1983) (quotations omitted); *see also New Orleans Waterworks*, 125 U.S. at 30–31.

Legislation sets policy and applies generally—it "looks to the future, and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power." *Prentis v. Atl. Coast Line Co.*, 211 U.S. 210, 226 (1908). In other words, "[a] legislative act involves policy-making rather than mere administrative application of existing policies." *Crymes v. DeKalb Cty., Ga.*, 923 F.2d 1482, 1485 (11th Cir. 1991); *see also 75 Acres, LLC v. Miami-Dade Cnty., Fla.*, 338 F.3d 1288, 1296 (11th Cir. 2003) (looking to the "generality and prospectivity of government action to decide whether a government action is legislative.").

Executive or administrative action, meanwhile, takes the policies established by legislation and applies them to specific situations. *Crymes*, 923 F.2d at 1486 (administrative action involves "application of policy to a specific party."). Thus, as this Court has previously held, "[i]f the facts utilized in making a decision are specific, rather than general, in nature, then the decision is more likely administrative. Moreover, if the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature." *Id.*; *see also Smith v. Lomax*, 45 F.3d 402, 406 (11th Cir. 1995) (decision appointing clerk was administrative, not legislative).

Here, the Board's adoption of the Resolutions purporting to authorize the Option Agreement was clearly executive or administrative

in nature, not legislative.[10] As numerous other courts around the country have held, "purchasing county property [is an] action[ ] whereby the Board applies known rules and legislation to make an administrative business decision." *Kamplain v. Curry Cty. Bd. of Comm'rs*, 159 F.3d 1248, 1252 (10th Cir. 1998); *Chicago Miracle Temple Church, Inc. v. Fox*, 901 F. Supp. 1333, 1343 (N.D. Ill. 1995) (holding that village board vote to authorize purchase offer for property was not legislative act because it was not an enactment or promulgation of public policy); *Lacorte v. Hudacs*, 884 F.Supp. 64, 70–71 (N.D.N.Y. 1995) (concluding that adoption of resolution denying contract to alleged low-bidders was more properly characterized as an administrative act); *Three Rivers Cablevision, Inc. v. City of Pittsburgh*, 502 F. Supp. 1118, 1136 (W.D.Pa. 1980) (holding that city council vote to award competitively bid contract "was clearly an administrative act").

Likewise, the Constitution and laws of Georgia established a policy giving the Board certain authority to enter into contracts and

---

[10] The mere fact that the Board enjoys legislative authority does not mean that all of its acts are legislative. As the Camden County governing authority, the Board of Commissioners enjoys a mix of legislative, executive, and judicial authority. *Cf. Glynn Cty. Bd. of Educ. v. Lane*, 261 Ga. 544, 545, 407 S.E.2d 754 (1991) (board of education "has the capacity to act as a legislative body, an executive body, and a judicial body.").

dispose of county property.[11] The Board applied that policy to this specific situation by adopting the Resolutions to authorize a specific contract with a specific party regarding a specific piece of Property. The decision to adopt the Resolutions was therefore administrative, not legislative. The same rationale also applies to the Referendum which repealed the Resolutions. Thus, the Contracts Clause is irrelevant to the issues in this case.

This stands in stark contrast to the *Busbee* case the district court relied heavily upon. 235 Ga. at 752; ECF 75 at 19–20. In that case, the General Assembly passed an appropriations act that included $11,510,000 for faculty salary increases at Georgia's universities. *Busbee*, 235 Ga. at 752–53. Once the act was signed into law, the Board of Regents began executing specific contracts with many faculty members in reliance on those appropriated funds. *Id.* at 753. But in the months that followed, it turned out that the revenue projections the legislature relied upon were overly optimistic, requiring significant reductions in the fiscal year's appropriations to maintain a balanced budget. *Id.* The governor called a special session at which the legislature eliminated many of the increases they had passed just a few months prior, including the $11,510,000 that had been appropriated for

---

[11] Subject, of course, to the people's ultimate review and veto. *See supra* § I.

the faculty salary increases. *Id.* No longer having the necessary appropriations to support their new contracts, the Board of Regents informed its faculty that they would continue being paid at their old salary rates rather than the new ones they had just agreed to. *Id.* The faculty members then sued, and the Georgia Supreme Court affirmed the contracts, holding that they could not be retroactively affected by a new appropriations act. *Id.* at 760–62.

The stark differences between *Busbee* and this case should be clear. Whereas this case involves only the approval and rejection of specific contracts with no change in general policy, the *Busbee* case involved specific contracts enacted pursuant to a general policy—in that case, an appropriations act—that was later amended in a way that affected the specific contracts at issue. 235 Ga. at 752–54. In other words, *Busbee* involved new legislation that affected contractual rights that had been acquired based on old legislation. This case does not. Moreover, there was no law in existence which suggested that the contracts at issue in *Busbee* were subject to future changes in appropriations by the legislature. *Id.* By contrast, the Constitution and the Georgia Supreme Court make clear that *all* county officials' actions—including the approval of public contracts—are subject to repeal by the voters.

In short, the Georgia Constitution's Contracts Clause does not preclude the Referendum from voiding the Option Agreement because

neither the Referendum nor the Board Resolutions which it repealed were legislation and thus were not subject to the Contracts Clause's prohibitions.

### 2. Union Carbide did not have any "vested" rights in the Option Agreement.

Even if the Referendum was "legislative," the Contracts Clause does not bar the "retroactive" repeal of the Board Resolutions because Union Carbide did not have any "vested" rights in the Option Agreement.

An action "does not operate retrospectively in its legal sense simply because it relates to antecedent facts[.]" *See DeKalb Cty. v. State*, 270 Ga. 776, 778, 512 S.E.2d 284 (1999) (quotations omitted); *see also Landgraf v. USI Film Prod.*, 511 U.S. 244, 269 (1994) ("A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law."). Rather, to be "retroactive" in the sense prohibited by the Contracts Clause, a law must "take away or impair *vested* rights acquired under existing laws[.]" *DeKalb Cty. v. State*, 270 Ga. at 778 (quoting *Ross v. Lettice*, 134 Ga. 866, 868, 68 S.E. 734 (1910)) (cleaned up and emphasis added).

"To be vested, in its accurate legal sense, a right must be complete and consummated, and one of which the person to whom it belongs cannot be divested without his consent. A divestible right is never, in a

– 35 –

strict sense, a vested right." *Borders v. City of Atlanta*, 298 Ga. 188, 198, 779 S.E.2d 279 (2015) (quoting *Merchants' Bank v. Garrard*, 158 Ga. 867, 871(2), 124 S.E. 715 (1924)). In other words, a right is not vested if it is conditional. *See Pritchard v. Savannah St. & R. R. R. Co.*, 87 Ga. 294, 13 S.E. 493 (1891) ("It is not unconstitutional for the legislature to take away a right which is not vested, but contingent upon some event subsequent to the date of the statute."); *see also United States v. Chen*, 821 F. Supp. 2d 454, 457 (D. Mass. 2011) (rights which are conditional are not vested); *Romines v. Great-W. Life Assur. Co.*, 865 F. Supp. 607, 610 (E.D. Mo. 1994), *aff'd*, 73 F.3d 1457 (8th Cir. 1996) (same); *Rush v. Fed. Deposit Ins. Corp.*, 747 F. Supp. 575, 578 (N.D. Cal. 1990) (same).

Here, Union Carbide's rights in the Option Agreement were not vested because it was voidable. As discussed above, the Home Rule Paragraph provides voters the ability to revoke or rescind actions taken by their elected county officials through a referendum. *Supra* § I.A. The people had enjoyed this right for decades, and it was read into the Option Agreement. *See Satterfield v. Southern Regional Health Care Sys.*, 280 Ga. App. 584, 586, 634 S.E.2d 530 (2006) (quotations omitted). ("The laws which exist at the time and place of the making of a contract, enter into and form a part of it; and the parties must be presumed to have contracted with reference to such laws and their effect on the subject matter."); *Malcom*, 211 Ga. at 456 ("Persons dealing with a

public officer must take notice of the extent of his powers at their peril."); *City of Gainesville v. Edwards*, 112 Ga. App. 672, 674, 145 S.E.2d 715 (1965) ("Persons dealing with governmental bodies are presumed to know the extent of the latter's authority[.]"). Thus, the Referendum "did not impose a sudden, unanticipated change in contractual obligations; [Union Carbide was] on notice that at any time the local community could vote" against the Option Agreement. *M & F Supermarket, Inc. v. Owens,* 997 F. Supp. 908, 915 (S.D. Ohio 1997).

Like the "reserve clause" cases discussed above, *supra* pp. 21–22, the fact that the public exercised their right to express their clear opposition to the Option Agreement—by a 3-to-1 margin with nearly 75% opposing—therefore did not affect any "vested" rights, meaning the Contracts Clause is irrelevant to the analysis here. *See City of Waycross v. Bennett*, 356 Ga. App. 713, 720, 849 S.E.2d 33 (2020) ("when the "contract terms themselves provide for subsequent amendment, modification, or termination, no 'vested' right under the contract is created.").

### III. The voluntary-payment doctrine does not bar recovery of funds paid out under a void and unauthorized contract.

The district court also erred when it said that the voluntary-payment doctrine barred the County's claims. "The ordinary rule governing individuals that, when a contract is illegal or against public policy, the law will leave the parties where it finds them, does not apply

where the public is one of the parties." *Burke*, 54 Ga. App. at 81. As the district court acknowledged, "[t]he voluntary payments doctrine does not preclude recovery when a county attempts to recover funds that were paid pursuant to an illegal or void contract." ECF 75 at 24. Because the contract was rescinded and void, as discussed above, the voluntary payment does not apply. *See supra* § I; *Burke*, 54 Ga. App. at 249 ("wrongful payment by public officer is not voluntary payment so far as public corporation is concerned.").

Moreover, the voluntary-payment doctrine only applies "where all the facts were known." O.C.G.A. § 13-1-13. Because the Option Agreement was merely voidable and not yet void when the payments were made, the relevant facts were *not* known. Thus, the voluntary-payment doctrine would not apply for this independent reason.

## CONCLUSION

For the reasons stated above, the Court should reverse the judgment below and remand the case with instructions to deny Union Carbide's motion to dismiss.

Respectfully submitted this 9th day of February, 2024.

/s/ *Edward A. Bedard*
Edward A. Bedard
Jeremy U. Littlefield
Richard L. Robbins
ROBBINS ALLOY BELINFANTE
 LITTLEFIELD LLC

500 14th St. NW
Atlanta, GA 30318
Tel: (678) 701-9381

*Counsel for Appellant
Camden County*

# ADDENDUM – RELEVANT CONSTITUTIONAL TEXT

## Ga. Const. art. I, § 1, ¶ X
## Bill of attainder; ex post facto laws; and retroactive laws.

No bill of attainder, ex post facto law, retroactive law, or laws impairing the obligation of contract or making irrevocable grant of special privileges or immunities shall be passed.

## Ga. Const. art. IX, § 2, ¶ I
## Home rule for counties.

(a) The governing authority of each county shall have legislative power to adopt clearly reasonable ordinances, resolutions, or regulations relating to its property, affairs, and local government for which no provision has been made by general law and which is not inconsistent with this Constitution or any local law applicable thereto. Any such local law shall remain in force and effect until amended or repealed as provided in subparagraph (b). This, however, shall not restrict the authority of the General Assembly by general law to further define this power or to broaden, limit, or otherwise regulate the exercise thereof. The General Assembly shall not pass any local law to repeal, modify, or supersede any action taken by a county governing authority under this section except as authorized under subparagraph (c) hereof.

(b) Except as provided in subparagraph (c), a county may, as an incident of its home rule power, amend or repeal the local acts applicable to its governing authority by following either of the procedures hereinafter set forth:

(1) Such local acts may be amended or repealed by a resolution or ordinance duly adopted at two regular consecutive meetings of the county governing authority not less than seven nor more than 60 days apart. A notice containing a synopsis of the proposed amendment or repeal shall be published in the official county organ once a week for three weeks within a period of 60 days immediately preceding its final adoption. Such notice shall state that a copy of the proposed amendment or repeal is on file in the office of the clerk of the superior court of the county for the purpose of examination and inspection by the public. The clerk of the superior court shall furnish anyone, upon written request, a copy of the proposed amendment or repeal. No amendment or repeal hereunder shall be valid to change or repeal an amendment adopted pursuant to a referendum as provided in (2) of this subparagraph or to change or repeal a local act of the General Assembly ratified in a referendum by the electors of such county unless at least 12 months have elapsed after such referendum. No amendment hereunder shall be valid if inconsistent with any provision of this Constitution or if provision has been made therefor by general law.

(2) Amendments to or repeals of such local acts or ordinances, resolutions, or regulations adopted pursuant to subparagraph (a) hereof may be initiated by a petition filed with the judge of the probate court of the county containing, in cases of counties with a population of 5,000 or less, the signatures of at least 25 percent of the electors registered to vote in the last general election; in cases of counties with a population of more than 5,000 but not more than 50,000, at least 20 percent of the electors registered to vote in the last general election; and, in cases of a county with a population of more than 50,000, at least 10 percent of the electors registered to vote in the last general election, which petition shall specifically set forth the exact language of

the proposed amendment or repeal. The judge of the probate court shall determine the validity of such petition within 60 days of its being filed with the judge of the probate court. In the event the judge of the probate court determines that such petition is valid, it shall be his duty to issue the call for an election for the purpose of submitting such amendment or repeal to the registered electors of the county for their approval or rejection. Such call shall be issued not less than ten nor more than 60 days after the date of the filing of the petition. He shall set the date of such election for a day not less than 60 nor more than 90 days after the date of such filing. The judge of the probate court shall cause a notice of the date of said election to be published in the official organ of the county once a week for three weeks immediately preceding such date. Said notice shall also contain a synopsis of the proposed amendment or repeal and shall state that a copy thereof is on file in the office of the judge of the probate court of the county for the purpose of examination and inspection by the public. The judge of the probate court shall furnish anyone, upon written request, a copy of the proposed amendment or repeal. If more than one-half of the votes cast on such question are for approval of the amendment or repeal, it shall become of full force and effect; otherwise, it shall be void and of no force and effect. The expense of such election shall be borne by the county, and it shall be the duty of the judge of the probate court to hold and conduct such election. Such election shall be held under the same laws and rules and regulations as govern special elections, except as otherwise provided herein. It shall be the duty of the judge of the probate court to canvass the returns and declare and certify the result of the election. It shall be his further duty to certify the result thereof to the Secretary of State in accordance with the provisions of subparagraph (g) of this Paragraph. A referendum on any such amendment or repeal shall not

be held more often than once each year. No amendment hereunder shall be valid if inconsistent with any provision of this Constitution or if provision has been made therefor by general law.

In the event that the judge of the probate court determines that such petition was not valid, he shall cause to be published in explicit detail the reasons why such petition is not valid; provided, however, that, in any proceeding in which the validity of the petition is at issue, the tribunal considering such issue shall not be limited by the reasons assigned. Such publication shall be in the official organ of the county in the week immediately following the date on which such petition is declared to be not valid.

(c) The power granted to counties in subparagraphs (a) and (b) above shall not be construed to extend to the following matters or any other matters which the General Assembly by general law has preempted or may hereafter preempt, but such matters shall be the subject of general law or the subject of local acts of the General Assembly to the extent that the enactment of such local acts is otherwise permitted under this Constitution:

(1) Action affecting any elective county office, the salaries thereof, or the personnel thereof, except the personnel subject to the jurisdiction of the county governing authority.

(2) Action affecting the composition, form, procedure for election or appointment, compensation, and expenses and allowances in the nature of compensation of the county governing authority.

(3) Action defining any criminal offense or providing for criminal punishment.

(4) Action adopting any form of taxation beyond that authorized by law or by this Constitution.

(5) Action extending the power of regulation over any business activity regulated by the Georgia Public Service Commission beyond that authorized by local or general law or by this Constitution.

(6) Action affecting the exercise of the power of eminent domain.

(7) Action affecting any court or the personnel thereof.

(8) Action affecting any public school system.

(d) The power granted in subparagraphs (a) and (b) of this Paragraph shall not include the power to take any action affecting the private or civil law governing private or civil relationships, except as is incident to the exercise of an independent governmental power.

(e) Nothing in subparagraphs (a), (b), (c), or (d) shall affect the provisions of subparagraph (f) of this Paragraph.

(f) The governing authority of each county is authorized to fix the salary, compensation, and expenses of those employed by such governing authority and to establish and maintain retirement or pension systems, insurance, workers' compensation, and hospitalization benefits for said employees.

(g) No amendment or revision of any local act made pursuant to subparagraph (b) of this section shall become effective until a copy of such amendment or revision, a copy of the required notice of publication, and an affidavit of a duly authorized representative of the newspaper in which such notice was published to the effect that said notice has been published as provided

in said subparagraph has been filed with the Secretary of State. The Secretary of State shall provide for the publication and distribution of all such amendments and revisions at least annually.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. Rule 32(a)(7)(B) because it contains 8,768 words as counted by the word-processing system used to prepare the document.

This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)–(6) because the document was prepared in Microsoft Word using the proportionally-spaced Century Schoolbook typeface in a 14-point font.

*/s/ Edward A. Bedard*
Edward A. Bedard